**Dissenting Opinion Filed Date August 18, 2020**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-18-00665-CV

### UNITED RENTALS NORTH AMERICA, INC., Appellant
### V.
### PAMELA EVANS, INDIVIDUALLY AND AS ADMINISTRATOR FOR THE ESTATE OF CLARK BRANDON DAVIS, AND DOMINIC JONES, Appellees

### On Appeal from the 191st Judicial District Court
### Dallas County, Texas
### Trial Court Cause No. DC-15-04449

## DISSENTING OPINION FROM DENIAL OF EN BANC RECONSIDERATION
Opinion by Justice Evans

This case presents an important, *res nova* question about race-conscious discriminatory state action in the trial of a civil lawsuit. The United States Supreme Court's decisions in *Batson* and *Edmonson*[1] collectively confirm that constitutional protections against de jure[2] racial discrimination apply to all citizens to ensure their

---

[1] *Batson v. Kentucky*, 476 U.S. 79 (1986); *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614 (1991).

[2] Efforts to ensure compliance with the federal equal protection guarantee are often complicated by challenges in identifying race or gender animus as the motivation underlying state action and determining whether it might be justified under the circumstances. *E.g.*, *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989). The one point that is clear in this jurisprudence is that deliberate, or "de jure," disparate

equal right to participate in our democratic processes, including service as a juror in civil cases. This particular civil case appears to be the first in the United States where a race- and gender-based *goal*—the substantial motivation—in selecting the jury was plainly and openly stated, and 100% of the peremptory challenges were perfectly consistent with that stated goal. My esteemed colleagues in the majority nevertheless conclude that neither *Batson* nor the Constitution was violated. Because I conclude otherwise, I dissent from our Court's declination to reconsider this case en banc and would reverse and remand it for a new trial.

## I.
### SUMMARY FACTS

This case regards a catastrophe that occurred when the tall load on a flat-bed semi-truck struck a bridge resulting in a bridge beam's falling on top of interstate highway traffic, killing Clark Brandon Davis.[3] Counsel for appellees Pamela Evans, individually and as administrator for the estate of Clark Brandon Davis, and Dominic Jones advised the trial court during the *Batson* hearing, "***We know from our focus groups that the African-American female is the most favorable juror for this case for whatever reason***." No one should be surprised that all of Evans and Jones's

---

treatment is highly problematic and often necessitates a remedy where so-called de facto, or disparate impact of an ostensibly neutral policy is concerned. *E.g.*, *Parents Involved in Cmty Schs. v. Seattle Sch. Dist. No. 1,* 551 U.S. 701, 793-95 (2007) (Kennedy, J., concurring) (collecting examples).

[3] The majority opinion fully describes the factual background.

peremptory strikes were consistent with that race- and gender-based goal for the jury's composition: 100% of Evans and Jones's strikes were of non-black males.[4]

Appellant United Rentals North America, Inc. challenged Evans and Jones's strikes complaining their admission in open court that race and gender animated their goal for the composition of the jury combined with 100% strikes of males violated *Batson*. I agree with United Rentals' argument that Evans and Jones's peremptory strikes were motivated in substantial part by their discriminatory intent to obtain, as near as possible, a black-female jury panel by excluding non-black males. I would therefore reverse and remand for a new trial as the Supreme Court of Texas did in *Powers v. Palacios*, 813 S.W.2d 489, 491 (Tex. 1991) (per curiam) ("We hold that equal protection is denied when race is a factor in counsel's exercise of a peremptory challenge to a prospective juror.").

---

[4] One male was recorded as "Hispanic" with no reference to whether he was also white and the four others who were struck were said to be "white." While United Rentals frames the issue broadly as a violation of *Batson* and its interpretation of the Equal Protection Clause, its arguments focused on gender animus rather than race. Because I agree with United Rentals' argument in that regard, I need not further develop the question as it might relate separately to race. *See State Office of Risk Mgmt. v. Martinez,* 539 S.W.3d 266, 273 (Tex. 2017). For purposes of this opinion, I mention the racial component throughout this opinion principally to demonstrate that Evans and Jones's strikes perfectly conformed to their stated goal of jury composition. I will note, however, that discriminatory strikes based on race are unconstitutional regardless of the race of the prospective juror. *See Price v. Short*, 931 S.W.2d 677, 683 (Tex. App.—Dallas 1996, no writ) (concluding striking white jurors was *Batson* violation); *see also United States v. Walker,* 490 F.3d 1282, 1291–92 n.10 (11th Cir. 2007) (same and noting majority of state courts have held combined race-gender claims also cognizable).

## II.
### OUTSOURCED DISCRIMINATION IS STILL DISCRIMINATION

Eight years after deciding *Batson*, the Supreme Court applied its holding to the exclusion of jurors based on gender in *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994). But eleven years later (nineteen years after *Batson*), in his concurring opinion in *Miller-El,* Justice Breyer lamented the persistence of race and gender in peremptory strikes:

> I am not surprised to find studies and anecdotal reports suggesting that, despite *Batson*, the discriminatory use of peremptory challenges remains a problem. See, *e.g.*, Baldus, Woodworth, Zuckerman, Weiner, & Broffitt, The Use of Peremptory Challenges in Capital Murder Trials: A Legal and Empirical Analysis, 3 U. Pa. J. Const. L. 3, 52–53, 73, n. 197 (2001) (in 317 capital trials in Philadelphia between 1981 and 1997, prosecutors struck 51% of black jurors and 26% of nonblack jurors; defense counsel struck 26% of black jurors and 54% of nonblack jurors; and race-based uses of prosecutorial peremptories declined by only 2% after *Batson*); Rose, The Peremptory Challenge Accused of Race or Gender Discrimination? Some Data from One County, 23 Law and Human Behavior 695, 698–699 (1999) (in one North Carolina county, 71% of excused black jurors were removed by the prosecution; 81% of excused white jurors were removed by the defense); Tucker, In Moore's Trials, Excluded Jurors Fit Racial Pattern, Washington Post, Apr. 2, 2001, p. A1 (in D.C. murder case spanning four trials, prosecutors excused 41 blacks or other minorities and 6 whites; defense counsel struck 29 whites and 13 black venire members); Mize, A Legal Discrimination; Juries Aren't Supposed to be Picked on the Basis of Race and Sex, But It Happens All the Time, Washington Post, Oct. 8, 2000, p. B8 (authored by judge on the D.C. Superior Court); see also Melilli, *Batson* in Practice: What We Have Learned About *Batson* and Peremptory Challenges, 71 Notre Dame L. Rev. 447, 462–464 (1996) (finding *Batson* challenges' success rates lower where peremptories were used to strike black, rather than white, potential jurors); Brand, The Supreme Court, Equal Protection and Jury Selection: Denying That Race Still Matters, 1994 Wis. L. Rev. 511, 583–589 (examining judicial decisions and concluding that few *Batson*

challenges succeed); Note, *Batson v. Kentucky* and *J.E.B. v. Alabama ex rel. T.B.*: Is the Peremptory Challenge Still Preeminent? 36 Boston College L. Rev. 161, 189, and n. 303 (1994) (same); Montoya, The Future of the Post-*Batson* Peremptory Challenge: Voir Dire by Questionnaire and the "Blind" Peremptory, 29 U. Mich. J.L. Reform 981, 1006, nn. 126–127, 1035 (1996) (reporting attorneys' views on the difficulty of proving *Batson* claims).

*Miller-El v. Dretke*, 545 U.S. 231, 268–69 (2005) (Breyer, J., concurring). Justice Breyer went on to describe that selection of jurors by race and gender was being taught to lawyers and used by jury consultants—human and software—contrary to *Batson*:

> [T]he use of race- and gender-based stereotypes in the jury-selection process seems better organized and more systematized than ever before. . . . For example, one jury-selection guide counsels attorneys to perform a "demographic analysis" that assigns numerical points to characteristics such as age, occupation, and marital status—in addition to race as well as gender. . . . Thus, in a hypothetical dispute between a white landlord and an African–American tenant, the authors suggest awarding two points to an African–American venire member while subtracting one point from her white counterpart. . . .
>
> For example, a bar journal article counsels lawyers to "rate" potential jurors "demographically (age, gender, marital status, etc.) and mark who would be under stereotypical circumstances [their] natural *enemies* and *allies*." . . .
>
> For example, materials from a legal convention, while noting that "nationality" is less important than "once was thought," and emphasizing that "the answers a prospective juror gives to questions are much more valuable," still point out that "[s]tereotypically" those of "Italian, French, and Spanish" origin "are thought to be pro-plaintiff as well as other minorities, such as Mexican and Jewish[;] [p]ersons of German, Scandinavian, Swedish, Finnish, Dutch, Nordic, British, Scottish, Oriental, and Russian origin are thought to be better for the defense"; African–Americans "have always been considered good for the plaintiff," and "[m]ore politically conservative minorities will be more likely to lean toward defendants." . . .

> For example, a trial consulting firm advertises a new jury-selection technology: "Whether you are trying a civil case or a criminal case, SmartJURY™ has likely determined the exact demographics (age, race, gender, education, occupation, marital status, number of children, religion, and income) of the type of jurors you should select and the type you should strike." . . .

*Id*. at 270–71 (internal citations omitted). Justice Breyer's last two examples predicted precisely what occurred here: the result of outsourced focus groups informed trial counsel to obtain black females for the jury. And counsel did so by using 100% of his peremptory strikes on non-black males.

*Batson* requires state action based on race or gender. In civil cases, what makes private parties' peremptory strikes state action is that the government administers the court system generally, and jury selection specifically, and delegates to private litigants the power of government to exclude jurors through peremptory strikes. *See Edmonson*, 500 U.S. at 622. So when a private party in a civil case declares it seeks black females for the jury and 100% of its strikes exclude non-black males, it is the same as the government's declaring it seeks jurors based on race and gender and excluding other jurors based on their disfavored race and gender: doing so violates the excluded prospective jurors' equal protection rights. *Id*. at 628. And the result of violating *Batson* is heinous:

> Race discrimination within the courtroom raises serious questions as to the fairness of the proceedings conducted there. Racial bias mars the integrity of the judicial system and prevents the idea of democratic government from becoming a reality.

*Id.*  So the importance of *Batson* is the fairness of the proceedings, the integrity of the judicial system, and participation in our democratic processes.

### III.
### *BATSON*'S GOAL:  FULL PARTICIPATION IN OUR DEMOCRATIC PROCESSES

Our system of trial by jury is an integral part of our democratic processes so it requires no discrimination in the selection of jurors.

> The American tradition of trial by jury, considered in connection with either criminal or civil proceedings, necessarily contemplates an impartial jury drawn from a cross-section of the community. . . .  This does not mean, of course, that every jury must contain representatives of all the economic, social, religious, racial, political and geographical groups of the community; frequently such complete representation would be impossible.  But it does mean that ***prospective jurors shall be selected by court officials without systematic and intentional exclusion*** of any of these groups.  Recognition must be given to the fact that those eligible for jury service are to be found in every stratum of society.  Jury competence is an individual rather than a group or class matter.  That fact lies at the very heart of the jury system.  To disregard it is to open the door to class distinctions and discriminations which are abhorrent to the democratic ideals of trial by jury.

*Thiel v. S. Pac. Co.*, 328 U.S. 217, 220 (1946) (citations omitted) (emphasis added).

When the Supreme Court articulated its reasons for applying *Batson* to the exclusion of jurors based on gender, the Court expressly prohibited the exclusion of males and explained one purpose of *Batson* was to have full participation in our democratic processes:

> Discrimination in jury selection, whether based on race or on gender, causes harm to the litigants, the community, and the individual jurors who are wrongfully excluded from participation in the judicial process.  The litigants are harmed by the risk that the prejudice that motivated the discriminatory selection of the jury will infect the entire

proceedings. *See Edmonson*, 500 U.S., at 628, 111 S. Ct., at 2087 (discrimination in the courtroom "raises serious questions as to the fairness of the proceedings conducted there"). The community is harmed by the State's participation in the perpetuation of invidious group stereotypes and the inevitable loss of confidence in our judicial system that state-sanctioned discrimination in the courtroom engenders.

When state actors exercise peremptory challenges in reliance on gender stereotypes, they ratify and reinforce prejudicial views of the relative abilities of men and women. Because these stereotypes have wreaked injustice in so many other spheres of our country's public life, active discrimination by litigants on the basis of gender during jury selection "invites cynicism respecting the jury's neutrality and its obligation to adhere to the law." *Powers v. Ohio*, 499 U.S., at 412, 111 S. Ct., at 1371.

. . . .

Contrary to respondent's suggestion, this right extends to both men and women. *See Mississippi Univ. for Women v. Hogan*, 458 U.S., at 723, 102 S. Ct., at 3335 (that a state practice "discriminates against males rather than against females does not exempt it from scrutiny or reduce the standard of review"); *cf.* Brief for Respondent 9 (arguing that men deserve no protection from gender discrimination in jury selection because they are not victims of historical discrimination).

. . . .

When persons are excluded from participation in our democratic processes solely because of race or gender, this promise of equality dims, and the integrity of our judicial system is jeopardized.

*J.E.B.*, 511 U.S. at 140, 141, 146. So, our review of Evans and Jones's state action

of using 100% of their peremptory strikes to exclude non-black males is important

because they excluded those non-black males from participation in the democratic

processes, dimmed the promise of equality, and jeopardized the integrity of our

judicial system. And, "[w]e must consider this record in the light of these important principles." *Smith v. Texas*, 311 U.S. 128, 130 (1940).[5]

## IV.
**THE GOAL OF *BATSON*'S ANALYSIS IS TO UNCOVER ILLICIT DISCRIMINATION**

The three steps of the *Batson* analysis are the Supreme Court's prescribed methodology for courts to peel back the layers of stated reasons for peremptory strikes in order to ascertain whether even a single peremptory strike was "motivated in substantial part by discriminatory intent." *Flowers v. Mississippi*, 139 S. Ct. 2228, 2248 (2019) ("[T]he peremptory strike of at least one of the black prospective jurors (Carolyn Wright) was motivated in substantial part by discriminatory intent. As this Court has stated, the Constitution forbids striking even a single prospective juror for a discriminatory purpose."). Those three steps, as enhanced by *Miller-El*, are as follows. First, the party challenging the peremptory strike must establish a prima facie case of racial discrimination. *Batson*, 476 U.S. at 97. To establish a prima facie case, the challenging party may rely on "the totality of the relevant facts" giving rise to an inference of discriminatory purpose. *Id.* at 93–94. Once a prima facie case

---

[5] The fuller statement by the Supreme Court is,

> It is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community. For racial discrimination to result in the exclusion from jury service of otherwise qualified groups not only violates our Constitution and the laws enacted under it but is at war with our basic concepts of a democratic society and a representative government. We must consider this record in the light of these important principles. The fact that the written words of a state's laws hold out a promise that no such discrimination will be practiced is not enough. The Fourteenth Amendment requires that equal protection to all must be given—not merely promised.

*Smith*, 311 U.S. at 130 (footnote omitted).

has been established, at the second step the burden shifts to the striking party to come forward with a race-neutral explanation for the strikes. *Id*. at 98. The race-neutral explanation is a burden of production only, so the reason offered need not be "persuasive or even plausible," so long as it is clear, reasonably specific, and "based on something other than the juror's race." *Purkett v. Elem*, 514 U.S. 765, 768 (1995). Thus, at this second step, the trial court's sole task is to determine whether the explanation is facially valid. *Id*. If the striking party offers a race-neutral explanation, at the third step the challenging party must prove at least a single peremptory strike was "motivated in substantial part by discriminatory intent." *Flowers*, 139 S. Ct. at 2248; *see also Batson*, 476 U.S. at 98. At this step, the persuasiveness of the justification for the peremptory strike is the critical issue, and "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Purkett*, 514 U.S. at 768.

Making its pretext determination, the trial court must consider "all relevant circumstances." *Batson*, 476 U.S. at 96–97. In *Miller-El*, the Supreme Court analyzed certain factors it recognized as especially probative, including (i) whether a statistical disparity exists between the percentage of black and non-black potential jurors who were struck, (ii) whether the striking party questioned the black potential jurors before striking them, and (iii) whether the record supports or contradicts the striking party's explanation for its strikes. 545 U.S. at 239. We must make a "searching inquiry into the basis of the challenged strikes" so that *Batson* does not

become a "mere exercise in thinking up any rational basis" for a peremptory strike. *Id.* at 252.

We review a trial court's *Batson* ruling for an abuse of discretion. *Davis v. Fisk Elec. Co.*, 268 S.W.3d 508, 515 (Tex. 2008). A trial court abuses its discretion if it acts arbitrarily, unreasonably, or without reference to any guiding rules or legal principles. *Goode v. Shoukfeh*, 943 S.W.2d 441, 446 (Tex. 1997).

## V.
### *BATSON* ANALYSIS OF THIS RECORD

United Rentals argues that Evans and Jones's stated goal of black female jurors combined with using 100% of their peremptory strikes on non-black men was a sufficient showing of violation of *Batson* that all explanations were pretextual. United Rentals argued to the trial court:

> [H]e [prospective juror 1] is a male, much like everyone else they struck, and so I think what that comes down to is, and I'm going to use the words of Mr. Langdoc when he said they did a mock jury and they found that African-American women was – what -- were the -- where they're demographic that they wanted.
>
> . . . .
>
> And they are now using their strikes to get rid of every potential poor juror from a demographic perspective and not the answers. Now, they're going to use the answers that they attempt to justify, Your Honor. But, frankly, it is all pretextual.

United Rentals' argument is that Evans and Jones's peremptory strikes were motivated in substantial part by discriminatory intent demonstrated by (1) Evans and Jones's stated goal—their substantial motivation—of a race- and gender- based jury,

–11–

and (2) their state action of using 100% of their peremptory strikes to exclude non-black males consistent with their plan.

The Supreme Court framed the *Batson* steps in terms of examining the record for "an *inference* of discriminatory purpose." *Batson*, 476 U.S. at 93–94 (emphasis added). *Batson*'s three-step process thus reflects the reality, applied across equal protection and anti-discrimination jurisprudence that it will be the "**rare** case in which **direct evidence of discrimination** [is] available." *Rutherford v. Harris Cty*, 197 F.3d 173, 184 n.11 (5th Cir. 1999) (emphasis added); *see also U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983) ("There will seldom be 'eyewitness' testimony as to the employer's mental processes."). A stated race- and gender-based goal is direct evidence of the discriminatory intent: counsel informed the trial court of the plan—the substantial motivation—and executed the plan. That evidence may well stand for itself and obviate any need of further analysis. *E.g., Rutherford*, 197 F.3d at 184 n.11, ("Had this been the rare case in which direct evidence . . . was available Rutherford had the option of relying instead on such proof."). In all events, I will proceed to the *Batson* multi-step analysis.

## A. Prima Facie Case, Race Neutral Reasons, and Statistics

In the first *Batson* step, United Rentals was obligated to raise evidence supporting an inference of discrimination. It did so by asserting Evans and Jones were motivated by a race- and gender-goal and consistent with that goal exercised 100% of their strikes on non-black males. In addition, the prima facie requirement

became moot once Evans and Jones offered race-neutral explanations for the peremptory strikes and the trial court ruled on the *Batson* challenges. *See Shoukfeh*, 943 S.W.2d at 445.

In the second *Batson* step, Evans and Jones were required to offer race-neutral reasons which can be "implausible or fantastic justifications." *Purkett*, 514 U.S. at 768. Evans and Jones's stated race and gender goal directly fails *Purkett*, but their other stated reasons, detailed below, pass muster under *Purkett*.

In the third *Batson* step, the court should consider statistical data. *Miller-El*, 545 U.S. at 240-41. Because 100% of Evans and Jones's peremptory strikes were directed to non-black males, I address it before other considerations regarding each struck male. Evans and Jones's 100% strike rate executed the motivation provided by their focus groups, "***We know from our focus groups that the African-American female is the most favorable juror for this case for whatever reason***." In addition, the majority opinion points out Evans and Jones struck 42% of the men in the strike zone. The inference on this record is had they had more strikes, they would have struck more males. So, the statistical analysis weighs in favor of United Rentals' *Batson* challenge—100% of Evans and Jones's strikes were used to exclude the same gender.

## B. Third *Batson* Step regarding Prospective Juror 1—Mr. Ruiz

Eight prospective jurors were involved in the insurance industry, among whom was prospective juror 1, Mr. Ruiz. Evans and Jones explained their

peremptory strike of prospective juror 1 as based on (1) "he works for the insurance industry," (2) "[h]e is an attorney," and (3) "he came in afterwards and said that he would have -- he wanted to warn us that he would try to judge the case by the evidence but he would hold it against lawyers if he felt like the lawyers behaved badly." United Rentals argues Evans and Jones's peremptory challenge of prospective juror 1 while passing over prospective juror 11[6] demonstrates Evans and Jones's race- and gender-based criteria for their strikes. As to prospective juror 1's stated concern about lawyers possibly behaving badly, United Rentals points out the trial court stated, "And counsel, I don't think that's any different when I said every juror takes into consideration credibility, demeanor of attorneys. So I don't have a problem with him." But when the trial court challenged United Rentals that prospective juror 1 was both involved in the insurance industry and a lawyer, United Rentals made the statement quoted above at the beginning of this section V which clearly indicates United Rentals did not challenge Evans and Jones's strike of prospective juror 1 beyond their basic argument that Evans and Jones's struck all non-black males consistent with their objective to obtain black females on the jury.

## C. Third *Batson* Step regarding Prospective Juror 8—Mr. Ellis

Evans and Jones explained their peremptory strike of prospective juror 8 twice to the trial court:

---

[6] Prospective juror 11 was a black female who worked for United Healthcare handling claims.

Number 8 worked for TxDOT. TxDOT is a key piece of this case and that there's the allegation and discussion about whether TxDOT approved the changes that we allege are the basis of the nexus for two of the parties. He stated that, quote, accidents happen and when accidents happen it doesn't have to mean someone is at fault.

. . . .Number 8, he stated -- our quote was that he said, based upon what was said yesterday, I already believe that some of the defendants are not responsible. Indeed No. 8 was someone that we put on our for cause list because we believe that was something that for cause we did not intentionally move for cause when we brought them in because we didn't think that was going to get to that point. He also said accidents happen. And just because an accident happened doesn't mean someone has to be responsible.

Prospective juror 8 was sixty-five years old and his work history some forty-five years earlier included having been a summer intern at TxDOT. Secondly, what he said was:

I think just based on what was said yesterday, I would want to hear all the evidence, because I think there are parties of this that are probably not responsible . . . and even they, like I said, accidents, even at construction sites happen. Even if they knew that there was a possibility of an accident, they may have had no responsibility or - - or guilt in that - - in that happening.

So, he responded to the information about the lawsuit provided to that point in voir dire that he needed to "hear all the evidence" and that parties may not be responsible for accidents which can happen without parties having responsibility. He correctly stated that the liability of the parties had to be proven with evidence; that liability was not automatic.

## D. Third *Batson* Step regarding Prospective Juror 19—Mr. Judd

Evans and Jones stated they struck prospective juror 19 because he had successfully recovered $400,000 from a lawsuit after being struck by a semi-truck. They framed their concern as prospective juror 19 might put all the blame on the truck driver or not award the tens of millions of dollars Evans and Jones sought to recover. Lastly, Evans and Jones urged "he strongly agreed that most people who file commer -- personal injury lawsuits are looking for money they don't deserve."

Regarding his prior lawsuit, prospective juror 19 answered question 11 on the questionnaire about any motor vehicle accident, lawsuit, and recovery stating, "YES — SELF — SEMI TRUCK STRUCK MY CAR — HAD MINOR INJURIES — SUED FOR PAIN & SUFFERING." In answer to questions 19 and 20 about mental anguish and punitive damages for personal injuries, he answered, "IF DAMAGES ARE PROVED, THERE SHOULD BE SOME TYPE OF AWARD." And other than counsel's statement during the *Batson* hearing that prospective juror 19 recovered $400,000, nothing could be located in the record to support that statement and Evans and Jones do not mention it or support it in their brief.

United Rentals argues Evans and Jones skipped over prospective juror 7, a black female who indicated she had been struck by a truck.[7] She answered question

---

[7] United Rentals also argues a Hispanic male prospective juror lower in the strike zone answered he "was rear ended by 18-wheeler from behind while stopped on freeway" but was not struck. United Rentals further argues two black female prospective jurors provided car accident information one of whom had a near-miss of a truck wheel that came off.

15 on the questionnaire regarding "an unfavorable experience or incident with an 18-wheeler," by checking "☑ Yes" and explaining (upper and lower case all the same size in original), "TRUCK DRIVER STRUCK ME AND DID NOT STOP I dont [sic] THINK he SAW me as I was in a SMAll CAR." Evans and Jones's only response is the record does not indicate she was injured or sued. But that contradicts their stated reason that their concern was about jurors who might hold the truck driver responsible because of a prior accident with a truck.

Regarding Evans and Jones's reason that prospective juror 19 "strongly agreed that most people who file . . . personal injury lawsuits are looking for money they don't deserve," what was actually asked of the panel was two questions combined followed by one answer:

> [Counsel]: Some scaled questions, and here's what that means. You're going to answer this question strongly agree, agree, disagree or strongly disagree. Four choices. And I'll ask those of you who strongly agree first.
>
> Most people who filed personal injury lawsuits are trying to get money they don't deserve. Who strongly agrees with that? *There should be limits to the amount of money that someone can recover in a personal injury lawsuit. Who strongly agrees with that?* Number 2, No. 5, No. 15, 16, 18, 19, 21, 12, 24, 44, 46, 47, 48, 50, 51, 56 and 69.

(Emphasis added.) So, the last question before the panel was whether prospective jurors thought there should be limits to the amount of money that can be recovered. That is not Evans and Jones's expressed reason so it does not support Evans and Jones's stated reason for their strike. And neither counsel nor courts are permitted

–17–

to add or think up reasons afterwards to justify a strike under *Batson*; the only reasons to justify a strike are the ones stated in explanation of the strike during the *Batson* hearing. *See Miller-El*, 545 U.S. at 252 ("A *Batson* challenge does not call for a mere exercise in thinking up any rational basis. If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false.").

It is understandable from Evans and Jones's perspective why they passed over striking prospective juror 7, Ms. Sanford, and instead struck prospective juror 19, because prospective juror 7 was the demographic they sought for their jury and prospective juror 19 was the disfavored demographic.

### E. Third *Batson* Step regarding Prospective Juror 24—Mr. Peters

Evans and Jones's stated these reasons to the trial court for striking prospective juror 24:

> [W]e moved for cause on 24 and brought him in today and stated those reasons that were gender neutral reasons. He said that he would need a higher burden of proof yesterday. Today he walked back from that with the Court. His wife was hit by a trucker, and for the same reason as juror No. 19, we were concerned that he would assign all the blame to the trucker who was a non-trial defendant in this case. . . . Oh, and 24 also had raised his hand and said because the truck driver took the Fifth, I would assume that he was hiding something.

Starting with the burden of proof, Evans and Jones asked whether jurors would require more than the preponderance of evidence in awarding significant damages. Counsel sometimes used the standard metaphor of 51% for preponderance of the evidence. Several prospective jurors said they would require more, some even

quantified they would need 90% to award large damages. Counsel then asked the first two rows if they "[j]ust would need something closer to 90, 95 percent?" Prospective juror 24 was among those who raised their hands. When informed the trial court would instruct him he had to use 51%, he answered, "Like everybody else, I'm pretty black and white. . . . These are the rules. I can't – I'm not a big gray area type of person. . . . I could follow it. I probably would not be comfortable." Evans and Jones pivoted to the two rows behind him and pejoratively characterized his answer as, "If you force me to do it maybe I'll do it"—essentially that he had rehabilitated himself without questioning from defense counsel.

As for his wife's car accident, prospective juror 24 answered questions on the questionnaire as follows. In answer to question 11 about accidents, suits and recoveries, he wrote, "My wife — rear ended at stop light, spine injuries including herniated discs which she still deals with today so not fully recovered. She sued and won but not enough to cover her medical bills that continue to this day." In answer to question 16 about monetary recovery for personal injury lawsuits, he answered, "If warranted they should be compensated. My wife's personal injury lawsuit didn't supply enough money to deal with her pain/medical bills." In answer to question 19 about recovery for mental anguish, he answered, "Mental Anguish is real — funds should be included." In answer to question 20 about exemplary damages he answered, "If the defendant did something [illegible word crossed out] leading to injury, they should be responsible for damages." In voir dire, he further stated:

[Counsel for HNTB]: Your wife had a personal injury incident. Was there some concern about whether she was adequately compensated for that?

[Prospective juror 24]: No. Just -- it was a rush, I guess, case, so the [to] speak. The guy caused the accident, didn't want to be accountable for it. Her representing attorneys wanted to get it over with and move on to next one so, you know, candidly I'm skeptical of everybody in this courtroom right now.

THE COURT: Good answer -- no.

[Prospective juror 24]: I don't think that anybody had her best interest at heart and now 20 years later she can barely pick up our kids because she's still dealing with spine issues. And that's not part of what happened 20 years ago, but it is what it is.

Evans and Jones's explanation for their peremptory strike began by stating they moved to strike prospective juror 24 for cause regarding the burden of proof. But the trial court pushed back that her notes did not reflect that. United Rentals' response to the first two reasons given was, "[T]here were women and a Hispanic male who were *directly* involved in automobile accidents and shared the same initial skepticism as Mr. Peters regarding their ability to award millions of dollars in damages based on a preponderance-of-the-evidence standard but were not struck." Evans and Jones do not challenge this assertion.

Evans and Jones also explained that prospective juror 24's answer to their Fifth Amendment question was a basis for their strike. There were a series of attempts to inject into the trial the possibility that the truck driver was in the United States illegally which drew objections from defendants that the trial court sustained and instructed the venire panel they would hear no evidence about. Immediately

–20–

following, Evans and Jones embarked on questions about the driver asserting the

Fifth Amendment:

> [Counsel for Evans and Jones]: In this case we believe that the evidence will be that the gentleman driving the truck didn't speak English. We don't know whether or not he could even read signs in English if there were signs that warned him about the bridge. We know that he's had over a dozen citations before for things like having an improper load, speeding, not checking things, and we know when he's asked questions in the case, because his lawyer says don't answer any questions, plead the Fifth, I take the Fifth.
>
> We know that every organization that investigated the accident; TxDOT, DPS, NTSB says it's his fault. Regardless of what evidence you hear in the case, knowing that there's an individual who has multiple citations before and the allegations in the case from other side are, look, this is his fault, he shouldn't have had that tall of a load. Some people would say, I could never hold anyone responsible no matter the evidence except for that truck driver. Anyone feel like that?
>
> [Counsel for D Primoris Construction]: I object, Your Honor. I believe that's a commitment question.
>
> THE COURT: Okay. I'll let you rephrase, [counsel for Evans and Jones].
>
> [Counsel for Evans and Jones]: Yeah. Anyone feel like regardless of the evidence and regardless of the case, if there is a truck driver and he's had a lot of citations for doing stuff the wrong way, they could never find someone else also responsible for an injury but would always blame the truck driver; anyone feel like that?
>
> [Counsel for D Primoris Construction]: I object, Your Honor. That's another commitment question.
>
> THE COURT: Okay, counsel. [counsel for Evans and Jones], you need to rephrase.
>
> [Counsel for Evans and Jones]: Sure.

THE COURT: Okay. You are asking for a commitment question. I know where you're trying to go but you're asking a commitment question.

[Counsel for Evans and Jones]: So let's do this baby stuff. If someone takes the Fifth Amendment in a case and says I plead the Fifth and I'm not answering any questions, I will not do it, the lawyer says you are instructed not to answer any question, regardless of the evidence in the case and regardless of the instructions, would you be more likely to believe that that person was at fault than any defendant who did not take the Fifth Amendment?

[Counsel for D Primoris Construction]: I object. That's another commitment question --

THE COURT: Okay. I disagree. I'll allow that one. [Counsel for Evans and Jones] ?

[Counsel for Evans and Jones]: Okay. So I'll try to say the same one again. It's written down so I should be able to get it. If someone takes the Fifth Amendment in the case and says I refuse to answer the questions, I take the Fifth, regardless of the evidence and regardless of the Court's instructions, who of you are more likely or would believe that the person who took the Fifth was more likely to be at fault than any parties who did not take the Fifth?

[Counsel for D Primoris Construction[8]]: And I object respectfully, Judge. This is another commitment question.

THE COURT: I think you need to ask a broader question about their feelings about people who plead the Fifth and then go there.

[Counsel for Evans and Jones]: Sure. . . . Anyone in the courtroom. Someone takes the Fifth versus someone who doesn't take the Fifth, does anyone have -- start off and say, look, regardless of what evidence comes in, I'd have a tough time with the fact that one person just refused to answer questions?

---

[8] The reporter's record indicates counsel for Evans and Jones asserted this objection to their own question. It is an obvious typographical error, and counsel for D Primoris Construction asserted this objection.

The first unidentified juror to answer stated that would result in withholding information that then cannot be weighed in the decision because "[you] have one party giving me data or information than you have another." Another juror answered, "I would think people are hiding something, I mean, his guilt." Then Evans and Jones asked prospective juror 24,

[Counsel for Evans and Jones]: And so regardless of what the evidence was, if you had one party that took the Fifth and one party that didn't, would you be more likely to say I can only blame the party that pleads the Fifth because they're not telling me stuff?

[Counsel for D Primoris Construction]: I object. That's a commitment question.

THE COURT: Okay. [Counsel for Evans and Jones], you need to ask a broader question.

[Counsel for Evans and Jones]: Okay. 24.

[Prospective juror 24]: Speaking broadly --

[Counsel for Evans and Jones]: Yeah.

[Prospective juror 24]: Generally, if somebody says they're pleading the Fifth, I automatically assume they're trying to hide something.

[Counsel for Evans and Jones]: Yeah. No matter what the evidence is in the case, you just assume they're trying to hide something.

[Prospective juror 24]: Yes.

Evans and Jones then asked the entire panel who agreed with prospective juror 24's answer to which ten prospective jurors raised their hands. The first one stated when asked what he meant, "I think they're hiding something . . . . No matter what the evidence is. If they won't defend themselves or tell their side of the story I think

they're hiding something." When further questioning continued, counsel for D Primoris Construction objected, there was a discussion, and counsel for Evans and Jones stated he withdrew his question and moved to a different topic.[9]

Evans and Jones asked and obtained answers to the literal effect of asserting the Fifth Amendment: something that might be known is not revealed. The first juror to answer pointed out the result would be obtaining "data" from witnesses who did answer questions and not from anyone who asserted the Fifth Amendment, which may cause a difference in evidence between parties and that might affect the decision. That is true. And all the prospective jurors afterwards stated the first part of that answer, such as prospective juror 24's answer, "Generally, if somebody says they're pleading the Fifth, I automatically assume they're trying to hide something." That is a fact: asserting the Fifth Amendment hides whatever information is known to that person. It is the equivalent of stating a certain prospective juror has a mustache. Evans and Jones's use of the intelligent answer of prospective juror 24 who understood asserting the Fifth Amendment hides the information as an explanation for their strike is disingenuous.

### F. Third *Batson* Step regarding Prospective Juror 28—Mr. Swift

United Rentals completes its argument that all of Evans and Jones's strikes were motivated by the race and gender statement is demonstrated by their

---

[9] United Rentals cites this entire transcript and argues this line of questioning was withdrawn. The last question was, but United Rentals does not explain how the withdrawal of the last question resulted in the withdrawal of those previous questions and answers to which an objection was not asserted nor sustained.

peremptory challenge of prospective juror number 28. Because Evans and Jones represented to the trial court that "he didn't kind of directly answer, and on his questionnaire he wrote, depends as to everything," a more thorough review of the record is necessary.

### *Details in Record regarding Prospective Juror 28*

The trial court allowed "at least two days of voir dire. So – maybe three." So counsel had ample time to question the prospective jurors. The trial court appropriately prohibited counsel from explaining the facts of the case during their voir dire beyond the basic accident facts and what relationship the parties had to the accident and the lawsuit.

Prospective juror 28 was one of the non-black males whom Evans and Jones exercised the state action delegated to them by peremptorily striking him. But the only question Evans and Jones's counsel asked prospective juror 28 during voir dire was,

[Counsel]: 28? Where's 28? Your thoughts.

[Prospective juror 28]: I can't make a decision because we don't have, you know, we don't have more information.

Leading up to that question, Evans and Jones's counsel had asked other prospective jurors wide ranging questions about responsibility, liability, and damages. In his preceding questions, counsel neared the conclusion of his voir dire by asking the panel the usual wind-up question, "Anything that I should ask you where you say, look, in a case like this, if he'd only asked me these things he would have learned

these strong feelings I have about whatever?" Several prospective jurors responded with statements on various topics. So, Evans and Jones's question, "Where's 28? Your thoughts," inquired about anything prospective juror 28 wanted to comment about the prior jurors' answers or counsel's questions. Prospective juror 28 essentially answered that he would need to hear evidence before making a decision.

HNTB's counsel asked prospective juror 28 a few questions. Counsel was ending his voir dire examination and asked,

> [Counsel]: I'll just ask you one other because I don't want to exclude myself. What question, if any, come to -- about HNTB that you'd want answers; is there anything that comes to mind? Yes, sir.
>
> . . . .
>
> PROSPECTIVE JUROR:[10] What are the relationships between all the companies. [sic]
>
> [Counsel]: Okay. Good question. Mr. Swift, I've got to ask you. You're an author.
>
> [Prospective juror 28]: I am.
>
> [Counsel]: Can you tell me what type of things that you write?
>
> [Prospective juror 28]: I actually write under three pens. Under my middle name and last name, I write thrillers.
>
> [Counsel]: Okay.

---

[10] The reporter's record does not indicate this answer was stated by prospective juror 28. Counsel's next question possibly indicates this was stated by prospective juror 28.

Mr. Swift, prospective juror 28, completed his questionnaire as follows (identity questions omitted; handwritten check marks in boxes; handwritten answers in italics):

2. What is your current employment status? (check all that apply)

☑ Self-Employed [other options not checked]

3. What is the name of your current employer; what is your job title; and what do you do at work (if not currently employed, please provide this information for your most recent employer)

*Author*

4. Have you, or [your] spouse/significant other, ever owned a business, or served as company president, senior manager, or CEO? If YES, please explain the nature of the business.

*Yes. Publishing Small—My Books*

5. What is the highest level of education you have completed?

☑ Some college [other options not checked]

6. Do you, or your spouse/significant other, have special training or knowledge in any of the following areas?

[none checked]: ☐ Trucking industry ☐ Equipment rental business ☐ Claims handling ☐ Construction ☐ Civil engineering ☐ Law/legal ☐ Accounting ☐ Human Resources Please explain:

7. What is your marital status?

☑ Married [other options not checked]

If your spouse or partner is employed, what is the name of his/her employer and what does he/she do at work?

*Chase Bank*

8. Have you or someone close to you, ever sued an individual or entity or been sued by another individual or entity? If YES, please explain

*No*

9. Have you ever served as a juror before? ☑ Yes ☐ No

| Civil/Criminal | Charges/Allegations | Year | Did the jury reach a verdict? (Yes or No) | Were you the foreperson? (Yes or No) |
|---|---|---|---|---|
| *Criminal* | *Drug Possession* | *2011* | *Yes* | *No* |
| *Civil* | *Injury, Motor Accident* | *2013* | *Yes* | *No* |

10. Are you a licensed driver? If yes, please indicate the class (e.g., Class C, DCL, motorcycle, etc.) and approximately how many years you have had a license: Driver's license classification(s):

*Class C*

11. Have you, or anyone close to you, ever been involved in a motor vehicle accident that involved injury? If YES, please explain who, what happened, the types of injuries, whether that person(s) recovered, and whether that person filed a lawsuit:

*No*

12. Has anyone close to you ever died as a result of an accident of any type? If YES, please explain who, what happened, and whether a lawsuit was filed.

*No*

13. Have you, or anyone close to you, ever been accused of causing a serious injury to someone else? ☐ Yes ☑ No If YES, please explain who, what happened, the types of injuries, whether that person(s) recovered, and whether that person filed a lawsuit:

*No.*

14.  Have you ever been involved in a dispute where you believed a company or government agency failed to maintain certain safety standards that lead to injury or death?   ☐ Yes   ☑ No   If yes, what was the dispute and how was it resolved?

15.  Have you, or anyone close to you, ever had an unfavorable experience or incident with an 18-wheeler?   ☐ Yes   ☐ No   If YES, please explain:

*No.*

16.  What are your opinions or feelings about personal injury lawsuits asking for money?  Have you, a family member, or close friend ever had an unfavorable experience involving a personal injury lawsuit?

*Depends on the circumstances.    No.*

17.  What opinions, if any, do you have regarding Texas Department of Transportation (TxDOT), James Construction, HNTB Corporation, United Rentals, or Lares Trucking?  Have you ever had any unfavorable experiences with any of these entities?

*No opinions.*

18.  Have you, a family member, or close friend ever worked for Texas Department of Transportation (TxDOT), James Construction, HNTB Corporation, United Rentals, or Lares Trucking?   ☐ Yes   ☑ No   If YES, please explain.

19.  Some of the damages that may be sought in this lawsuit include awarding money for mental anguish.  What are your opinions regarding awarding money for mental anguish?

*Depends on the circumstances.*

20.  In this lawsuit there may be a request for punitive damages. Punitive damages are awarded to punish a defendants(s).  What opinions or beliefs, if any, do you have regarding punitive damage awards?

*Depends on the circumstances.*

21. This trial is expected to last three weeks. Is there any reason you cannot serve? ☐ Yes ☑ No If YES, please explain:

/s/

### *Analysis*

Here, Evans and Jones's explanation for striking prospective juror 28 was:

> 28 is the gentleman who's a writer and writes thrillers. He's served on two juries. We asked him about the juries. We asked him about a number of questions which he didn't kind of directly answer, and on his questionnaire he wrote, depends as to everything. When we got to him we candidly said, look, we don't have enough information and we can't take a chance on him. Jane told me, John, I'm afraid this is someone who is going to want to write about this case, and there's a chance he's not going to write good things about it. So those are our gender neutral or they're also doing, I guess, a protected class … neutral basis.

Evans and Jones's stated reasons were prospective juror 28 was a writer, he served on two juries, he answered the questionnaire, "depends as to everything," and they did not have enough information about him.

In *Miller-El*, the second aspect of the searching inquiry is to consider whether counsel questioned the jurors he struck about the stated reasons for striking them. *Id.* And, third, we compare prospective juror 28 to other jurors. Evans and Jones's first stated reason was that prospective juror 28 was an author and they were concerned he would write about this case. Evans and Jones did not ask prospective juror 28 anything about his self-published writings: no questions about whether the subject matters of his writings ever pertained to court cases, whether he had written about the two trials in which he participated as a juror, or whether he *might* write

about this trial. (HNTB asked only one question learning prospective juror 28 wrote "thrillers"). It is so common for jurors to write about trials on social media platforms that the supreme court has ordered trial courts to instruct all the jurors not to do so *before* trial concludes: "Do not post information about the case on the Internet *before these court proceedings end and you are released from jury duty*." Jury Instructions Prescribed by Order under Rule 226A, effective April 13, 2011 (emphasis added) (published with TEX. R. CIV. P. 226a). So the entire panel was authorized by the supreme court's instruction to write and post about the trial after the trial. That makes all of the prospective jurors writers who self-publish their thoughts. Evans and Jones's counsel did not ask any juror about whether they posted to social media about past trial experiences (others had served on juries), whether they might do so about this case, or mention to the trial court any concern about them doing so. The Texas Supreme Court decided relying on a juror questionnaire that a juror's occupation was a musician then striking that juror for that reason without asking questions and without asking the other jurors relevant job-related questions is pretextual. *See Davis*, 268 S.W.3d at 521–22 ("We note that Fisk never questioned Pickett about his job but instead relied on Pickett's juror information card, which stated that Pickett was a musician employed by Pleasant Hill Baptist Church," and observing, "It is difficult to imagine that [the struck black panel member] . . . was less desirable than these jurors because of his musical career.") (citing *Miller–El*, 545 U.S. at 244). That squarely applies to prospective juror 28's career as an author,

as United Rentals argues. Evans and Jones's stated reason for striking prospective juror 28 because he was a writer is extremely suspect as pretextual, and the lack of questioning weighs in favor of United Rentals' *Batson* challenge.

Evans and Jones's next reason for striking prospective juror 28 was, "He's served on two juries." Prospective juror 28 had answered in his questionnaire that he had served as a juror on a drug possession criminal case and a civil motor vehicle accident case, that he was not the presiding juror in either, and that the jury reached a verdict in both. Evans and Jones did not ask him whether the verdict in the motor vehicle accident case was for the plaintiff or defendant; if for the plaintiff, how much was requested and how much the jury awarded; or anything about the trial and deliberations such as whether he had a good or bad experience that he would bring with him to service on this jury. Nor were any questions asked about the criminal trial. In addition, Evans and Jones argued that one of United Rentals' peremptory strikes was pretextual because prior jury service was irrelevant:

> [P]rior service on a jury, even if it was the foreperson in an unrelated case is in our view not a clear and reasonably specific explanation showing a legitimate reason related to the facts of this case. And, accordingly, we object.

Evans and Jones are correct; prior jury service is unrelated and when combined with their failure to ask questions about prospective juror 28's past jury service this reason is pretextual, weighing in favor of United Rentals' *Batson* challenge.

Evans and Jones's last reason for striking prospective juror 28 was that,

We asked him about a number of questions which he didn't kind of directly answer, and on his questionnaire he wrote, depends as to everything. When we got to him we candidly said, look, we don't have enough information and we can't take a chance on him.

Contrary to what they told the trial court, Evans and Jones orally asked prospective juror 28 only, "28? Where's 28? Your thoughts."—a very nice, open-ended question, about anything prospective juror 28 wanted to say. And what he said was perceptively accurate, "I can't make a decision because we don't have, you know, we don't have more information." So, prospective juror 28 answered that he wanted evidence, "more information," before he started forming opinions and impressions.

And that oral answer is consistent with his questionnaire answers about which Evans and Jones complained to the trial court, "on his questionnaire he wrote, depends as to everything." That's simply not true. On his questionnaire, prospective juror 28 answered 21 questions. Eleven answers (questions 1–7, 9, 10, and 21) provided background information about himself and his spouse or significant other. Seven questions (8, 11–15, and 18) asked for an explanation if a condition existed (been sued, motor vehicle accident, death of someone close as a result of an accident, accused of seriously injuring someone, dispute with a company or government, or accident with an 18-wheeler). Prospective juror 28 answered, "No," to each condition, so he had nothing to explain. One question (17) asked whether he had any opinions about the defendants, he answered he had none. So that leaves three

questions (16, 19, and 20) to which prospective juror 28 actually answered "depends":

> 16. What are your opinions or feelings about personal injury lawsuits asking for money? Have you, a family member, or close friend ever had an unfavorable experience involving a personal injury lawsuit?
>
> *Depends on the circumstances.    No.*
>
> 19. Some of the damages that may be sought in this lawsuit include awarding money for mental anguish. What are your opinions regarding awarding money for mental anguish?
>
> *Depends on the circumstances.*
>
> 20. In this lawsuit there may be a request for punitive damages. Punitive damages are awarded to punish a defendants(s). What opinions or beliefs, if any, do you have regarding punitive damage awards?
>
> *Depends on the circumstances*.

Effectively, each of these answers stated prospective juror 28 could consider awarding money for personal injuries but needed evidence before he could form opinions: "Depends on the circumstances." In fact and in law, it does depend on the circumstances; it depends on the facts of each case and applicable law regarding liability and damages. And in answer to question 16, prospective juror 28 answered that neither he, "a family member, or close friend ever had an unfavorable experience involving a personal injury lawsuit." And United Rentals argues, "[*N*]*umerous*[11]

---

[11] I do not dispute the majority opinion's correction of United Rentals' argument due to one juror having been struck for cause.

panel members in the strike zone, such as Mr. Maldonado (a Hispanic),[12] Mr. Robleto (a Hispanic), Ms. Hatter (a black woman), Ms. Sanford (a black woman), Ms. Jackson (a black woman), Ms. Buentello (a Hispanic), and Ms. Owen (a woman), provided similar answers to the same questions but were not struck by Plaintiffs." (Emphasis and footnotes added.) Evans and Jones's failure to ask questions about their "depends as to everything" reason is strongly suspect as pretextual and weighs in favor of United Rentals' *Batson* challenge.

Not asking questions of jurors about the matters for which peremptory strikes are used is important in the third step of the *Batson* analysis. *Id*. As summarized by the Texas Supreme Court:

> Fisk's failure to question Daigle about his purported reaction also suggests that Daigle's reaction had little to do with Fisk's strike. *Miller–El II*, 545 U.S. at 246, 125 S. Ct. 2317 (noting that the prosecution's failure to question prospective juror about reason given for strike suggested pretext; prosecutor "probably would have [questioned him] if the family history had actually mattered") (citing *Ex parte Travis*, 776 So. 2d 874, 881 (Ala. 2000) ("[T]he State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination.")); *Alex v. Rayne Concrete Serv.*, 951 So. 2d 138, 154 (La. 2007) (noting that "the lack of questioning or mere cursory questioning before excluding a juror peremptorily is evidence" of pretext).

---

[12] While the record is silent as to further description of the prospective Hispanic jurors, the U.S. Census, a source of which we would be entitled to take judicial notice, estimates that more than 90% of those in Dallas County identified as Hispanic are also identified as white. *See* https://www.census.gov/quickfacts/fact/table/dallascountytexas/PST045219 (last visited Aug. 13, 2020).

*Davis*, 268 S.W.3d at 519. In essence, if the reason for the peremptory strike really mattered, the party exercising the peremptory strike would have asked about it. *Id*. Inversely, meaningful voir dire questioning about the reason for later striking a panel member indicates lack of pretext. So, the fact that Evans and Jones did not ask prospective juror 28 any questions about his self-published writings as distinguished from the entire panel's social media writings is most important in combination with not asking about his previous jury service and his 'need-some-evidence' answers to the questions about personal injury damages. This lack of questioning, even without the stated goal of black female jury composition, indicates the reasons are pretextual. *Id*.

Finally, there were several misstatements made about the record to the trial court. Evans and Jones stated, "We asked him about a number of questions which he didn't kind of directly answer," which is not true. Evans and Jones asked the most open question possible, "28? Where's 28? Your thoughts." In response, prospective juror 28 perceptively answered, "I can't make a decision because we don't have, you know, we don't have more information." If counsel did not think that answered his question, he should have followed up. And Evans and Jones's contention that "on his questionnaire he wrote, depends as to everything" is simply not true. Prospective juror 28 answered 3 out of 21 questions, "Depends on the circumstances," which were entirely appropriate answers to questions about personal injury recovery of money—it does depend on the circumstances of the facts and the

law. Again, if counsel was suspicious of that answer, he should have asked questions to gain insight or further information. A "misstatement [of the record in explanation of a peremptory strike] can be another clue showing discriminatory intent." *Flowers*, 139 S. Ct. at 2250. And several misstatements can indicate discriminatory intent.

> To be sure, the back and forth of a *Batson* hearing can be hurried, and prosecutors can make mistakes when providing explanations. That is entirely understandable, and mistaken explanations should not be confused with racial discrimination. But when considered with other evidence of discrimination, a series of factually inaccurate explanations for striking black prospective jurors can be telling. So it is here.

*Id*. Here, Evans and Jones's misstatements of the record, combined with their race- and gender-based goal for jury selection, 100% of the peremptory strikes implementing that discriminatory goal, and pretextual reasons about which they did not ask questions all lead to the only possible conclusion: Evans and Jones intended to strike non-black men from the jury in violation of *Batson*, *Edmonson*, and *J.E.P*.[13]

---

[13] In a single citation at the conclusion of its *Batson* argument in its brief, United Rentals invokes the Texas Constitution's protection under article 1, section 3a: "Equality under the law shall not be denied or abridged because of sex, race, color, creed, or national origin. This amendment is self-operative." TEX. CONST. art. I, § 3a. In a footnote, United Rentals argues we are "not constrained by federal equal protection jurisprudence." While that provision was indeed meant to "supplement the federal guarantees of equal treatment" and thus can logically provide only greater, not lesser protection, *Bell v. Low Income Women of Tex.,* 95 S.W.3d 253, 257 (Tex. 2002), United Rental presents us with no citation to authority or argument to develop this contention. In view of my conclusion that the strikes in this case violated the federal constitution, and thus, likewise, our own, I see no need of developing the external perimeters of the state guarantee at this stage. *See Dewberry v. State*, 4 S.W.3d 735, 744 (Tex. Crim. App. 1999) (noting that because appellant failed to distinguish his rights under the Texas Constitution from that of the federal Constitution and combined his points based on the state and federal Constitutions into one argument, "we only address whether appellant's rights under the United States Constitution were violated"); *see also Wargocz v. Brewer*, No. 02-17-00178-CV, 2018 WL 4924755, at *5 (Tex. App.—Fort Worth Oct. 11, 2018, no pet.) (mem. op.) (applying *Dewberry* to civil case).

In the third step, the persuasiveness of the justification for the peremptory strike is the critical issue, and "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Purkett*, 514 U.S. at 768. Courts must consider "all relevant circumstances," *Batson*, 476 U.S. at 96–97, and make a searching inquiry, because "without [a] searching inquiry into the basis of the challenged strikes, *Batson* would become a 'mere exercise in thinking up any rational basis." *Miller-El*, 545 U.S. at 252. Having done so, there is nothing positive in the record for Evans and Jones in the third *Batson* analytical step that overcomes the direct evidence that their peremptory strikes were substantially motivated by their plan to obtain black female jurors. There is only one conclusion that may be drawn from this record: the trial court abused its discretion when it denied United Rentals' *Batson* challenge and granted all of Evans and Jones's strikes.

## VII.
### CONCLUSION

For the reasons stated above, the trial court abused its discretion when it overruled United Rentals' *Batson* challenge to Evans and Jones's gender-based peremptory strikes.

Because the majority of the Court declines to reconsider this decision en banc and reverse and remand it, I respectfully dissent.


/David Evans/
DAVID EVANS
JUSTICE


Whitehill and Schenck, J.J., join this dissenting opinion.

180665DF.P05